# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

------------------------

UNITED STATES OF AMERICA,

     Plaintiff,

v.                                            No. 5-CR-2770 WJ/LFG

CAMILLE SUZANNE LENTE,

     Defendant.

## AMENDED[1] MEMORANDUM OPINION AND ORDER ON THE RESENTENCING OF DEFENDANT

     Following a horrific drunk driving vehicular crash resulting in three deaths and one surviving victim with serious injuries, Defendant Camille Lente, the other crash survivor, pled guilty to three counts of involuntary manslaughter and one count of assault resulting in serious bodily injury. While the Defendant's advisory sentencing Guidelines range calculated under the U.S. Sentencing Guidelines called for a sentence of 46 to 57 months, the District Court sentenced Lente to 216 months' imprisonment, which was 159 months above the upper end of the Guidelines range. On appeal, a divided panel of the Tenth Circuit vacated Lente's sentence and remanded to this Court for resentencing. Having considered all the factual and legal matters presented in the extensive record before this Court, as well as the arguments, statements and testimony presented at the hearing on July 22, 2010, this Court varies upward from the

------------------------

[1] This Amended Memorandum Opinion and Order replaces the Memorandum Opinion and Order filed on August 9, 2010 (Doc. 93) and reflects several minor revisions made pursuant to Defendant's Sentencing Objections (Doc. 95) as noted in the Court's Order Sustaining in Part and Overruling in Part Defendant's Sentencing Objections (Doc. 96). This Amended Memorandum Opinion and Order does not alter the length of Defendant's sentence.

Guidelines and sentences Defendant Lente to a term of 192 months' imprisonment.

## FACTUAL BACKGROUND[2]

On December 2, 2005, after consuming excessive amounts of alcohol, Defendant Lente drove her mother's Chevrolet Suburban on New Mexico State Road 47 within the exterior boundaries of the Isleta Indian Reservation in New Mexico. Anthony Tewahaftewa, a friend of Lente's, was riding in the front passenger seat. At approximately 10:40 p.m., Lente, who was traveling northbound, swerved across the center line of the highway and crossed into the southbound traffic lane. She collided with a Ford Ranger pickup truck, driven by Jessica Murillo. Ms. Murillo was driving her 12-year-old brother, Andres Murillo, and her 17-year-old boyfriend, Joshua Romero, back from Albuquerque where the three had gone to see a movie. Anthony Tewahaftewa, Andres Murillo and Joshua Romero all died immediately on impact. The autopsy reports for the three deceased victims indicate that all three died of severe, multiple blunt force injuries sustained during the crash. Jessica Murillo survived, but sustained fractures to her right femur, right shoulder, and right ankle, and received numerous facial lacerations. In the intervening months, Ms. Murillo underwent many hours of physical therapy just so she could walk again. Defendant Lente suffered two broken ankles and a dislocated hip. Immediately after the accident, both Jessica Murillo and Defendant Lente were transported to the University of New Mexico Hospital.

Two hours after the accident, hospital workers took a blood sample from Lente. The blood sample test results showed a blood alcohol level of 0.21—over two and one-half times the

---

[2] The factual background is based on the uncontested factual recitations in the Defendant's Presentence Report as well as those set forth by counsel in their written and oral presentations.

New Mexico legal limit of 0.8.  In addition, the test revealed that Lente had marijuana present in her system.  In subsequent interviews with agents from the Bureau of Indian Affairs, Lente admitted to drinking between 13 and 19 beers before the crash.  Finally, the agents discovered that Lente had never held a valid New Mexico drivers' license and that the Surburban she was driving was not insured.

**PROCEDURAL BACKGROUND**

On December 28, 2005, a four-count indictment was filed in the U.S. District Court for the District of New Mexico charging Lente with three counts of involuntary manslaughter, in violation of 18 U.S.C. §§ 13, 1153 and 1112, and one count of assault resulting in serious bodily injury, in violation of 18 U.S.C. §§ 1153 and 113(a)(6).  In July 2006, Lente entered into a plea agreement wherein she pled guilty to all four counts in the indictment.  In return, the United States stipulated that Lente had accepted responsibility and was therefore entitled to a three-level reduction in her base offense level under the U.S. Sentencing Guidelines.

The Presentence Report ("PSR").  The PSR calculated an advisory Guidelines sentencing range for Lente of 46 to 57 months based on an adjusted total offense level of 23 and a criminal history category of I, the lowest criminal history category in the sentencing guidelines.  Neither Defendant Lente nor the United States disputed the PSR's calculation of Lente's Guidelines range—either in the initial sentencing proceedings or these proceedings.  While the U.S. Probation Officer preparing the PSR did not identify any grounds for either a downward or upward departure within the framework of the sentencing Guidelines, the probation officer *did* recommend that the Court vary upward, pursuant to 18 U.S.C. § 3553(a)(1-7).  The PSR noted a variety of grounds for the upward variance, including Lente's extremely high blood alcohol level, the severe impact to the victims' families and Lente's initial attempt to shift blame to her

3

deceased passenger Anthony Tewahaftewa.  The PSR also noted that Lente was a frequent offender who had not been deterred by her five prior convictions and five separate terms of probation, which all occurred in tribal court.  Accordingly, the probation officer recommended an upward variance in order to reflect the seriousness of the offense and promote respect for the law.  The United States adopted the PSR's recommendation as its own.  Defendant Lente, on the other hand, argued that an upward variance was unjustified and asked for a within-guidelines sentence.

      <u>Original Sentencing</u>.  In December 2006, the original sentencing judge, Senior U.S. District Judge John E. Conway, considered the factors enumerated in 18 U.S.C. § 3553(a) and decided to impose an upward variance.  The court gave the following reasons for the upward variance:

- Lente had an extremely high blood alcohol level of 0.21 percent.

- Lente had five tribal court convictions and three additional arrests, most of which involved the excessive use of alcohol and violence.  Despite being on probation five times, she continues to abuse alcohol and break the law.

- Lente had never been licensed to drive a vehicle in New Mexico.

- The families of the victims were severely impacted by the loss of the their children and siblings.

- Lente did not accept full responsibility for her actions, but attempted to shift some of the blame to her passenger by initially reporting to investigators that he tried to grab the steering wheel while they were traveling.

- Defendants convicted of illegal retry of an aggravated felon or drug offenses frequently receive sentences in Lente's Guidelines range of 46 to 57 months, yet

Lente's offense resulted in the death of three people and serious injury to another.

- Lente would benefit from the vocational and educational training programs offered by the Bureau of Prisons given that she has virtually no marketable job skills.

Relying on these points, the District Court imposed a sentence of 216 months' (or 18 years') imprisonment—approximately 159 months more than the top of the Guidelines range. In calculating the 216-month sentence, the judge imposed three consecutive 72-month sentences for the three counts of involuntary manslaughter (which was the maximum sentence Lente could receive for those counts), along with a concurrent term of 120 months for the count of assault resulting in serious bodily injury.[3] Those calculations resulted in a total term of incarceration of 216 months or 18 years.

<u>Tenth Circuit Appeal</u>. On appeal, a divided panel of the Tenth Circuit Court of Appeals vacated the sentence and remanded the case to this Court for resentencing. *United States v. Lente*, 323 Fed. App'x. 698 (10th Cir. 2009) (unpublished). However, the Tenth Circuit panel was unable to agree on a reason for the vacated sentence. Judge McWilliams, in dissent, voted to affirm the sentence. Judge Hartz and Judge Holmes both voted to vacate the sentence but for different reasons. In a short, one-paragraph opinion, Judge Hartz concluded that the Government had breached its plea agreement with Lente. Specifically, he faulted the Government for stipulating in the plea agreement that Lente was entitled to a three-level reduction for acceptance of responsibility and subsequently endorsing the PSR's recommendation that the court vary upward in part because of Lente's failure to accept responsibility. Citing *U.S. v. Cachucha*, 484

---

[3] The United States did not seek to have any of the 120-month sentence for Count IV run consecutive to the 216 months recommended for Counts 1, 2 and 3.

F.3d 1266, 1271 (10th Cir. 2007), Judge Hartz noted that the only relief for breach of a plea
agreement is for the court to remand the case to another judge for resentencing.

Judge Holmes, in an extensive, 40-page opinion, found that Lente's 216-month sentence
was substantively unreasonable.  Judge Holmes began by noting that a district court's
justification for imposing a sentence outside the Guidelines range must be "sufficiently
compelling to support the degree of the variance."  *Lente*, 323 Fed. App'x, at 704 (quoting
*United States v. Gall*, 128 S.Ct. 586, 597 (2007)).  Because the District Judge had imposed a
sentence which was approximately four times more than the high end of the Guidelines range,
the sentencing judge needed to provide significant justification for the variance.  Judge Holmes
then concluded that the "sparse record" created by the District Court could not support such an
extreme variance from the Guidelines range.  *Id.* at 706 ("While, as noted below, the district
court's reasons might well justify *some* upward variance, I simply cannot conclude on this record
that they justify the major variance that Ms. Lente received.").  Judge Holmes analyzed each of
the sentencing judge's proffered reasons and explained why they could not, in isolation or
combination, support the weight of the variance.

- Excessively High Blood Alcohol Content.  While Judge Holmes noted that an
  excessively high blood alcohol content could justify a limited upward variance, he found
  that the sentencing judge had not made any finding that Lente's BAC was "so
  extraordinarily high relative to most drunk driving cases involving fatalities to warrant its
  variance sentence."  *Id.* at 706-07.  In other words, the judge had no evidence that Lente's
  case fell so far outside the "heartland" of drunk driving cases resulting in fatalities.

- No Drivers License.  Judge Holmes discounted entirely the sentencing judge's reliance
  on the fact that Lente had never been licensed to drive a motor vehicle in New Mexico

because the judge had provided no explanation of why this fact mattered. Judge Holmes noted that perhaps Lente's operation of a vehicle without a license provided additional evidence of her disregard of the law. Without such an explanation on record, however, Judge Holmes could not draw support for the sentence on this basis.

- <u>Tribal Court Convictions & Arrests</u>. Judge Holmes agreed that Lente's previous convictions and arrests could support some upward variance. He noted, however, that "all of her convictions were misdemeanors [and] of these, almost half were juveniles adjudications, and the majority were family disputes." *Id.* at 710. He noted further that none of the previous offenses involved drinking and driving, nor were they similar in kind or seriousness to the instant conviction. Accordingly, these prior offenses could not support such a major variance.

- <u>Failure to Accept Responsibility</u>. Again, Judge Holmes concluded that the sentencing court could "reasonably have given an appreciable amount of weight" to Lente's failure to accept responsibility. *Id.* at 710. However, Lente did ultimately accept full responsibility for her actions. More importantly, the sentencing judge had accepted the PSR's recommendation that she receive a three-level reduction to her base offense level for acceptance of responsibility. It was incongruent for the judge to accept this reduction in the base offense level, but then elevate Lente's sentence by such a huge margin on this basis.

- <u>Vocational & Educational Training</u>. Judge Holmes held that Lente's need for vocational and educational training could theoretically play a limited role in assigning her an upward variance, but faulted the sentencing judge for making "no findings that a 216-month sentence—as opposed to, for example, a shorter sentence in the Guidelines

7

range—was required to appropriately rehabilitate Ms. Lente." *Id.* at 711.  Without any
such findings, Judge Holmes entirely discounted this factor.

- Impact on Victims' Families.  While it was proper for the sentencing court to recognize
the impact on the victims' families, Judge Holmes noted that there are limits to which a
family's grief can increase a sentence.  Judge Holmes noted that drunk driving accidents
resulting in even harsher impacts to the victims' families had warranted much smaller
upward variances.  *Id.* at 711 (citing case in which court varied upward by one offense
level when death of victims resulted in the complete elimination of one branch of two
different families).

- Policy Disagreement with Guidelines.  Finally, Judge Holmes addressed the sentencing
judge's apparent disagreement with the policy judgments behind the Guidelines.  The
sentencing judge had noted that illegal reentry felons and drug offenders typically receive
sentences in Lente's Guidelines range, yet they are not usually responsible for three
deaths and one serious injury.  Judge Holmes found that the sentencing judge appeared to
harbor "a belief that the Guidelines categorically under-punish involuntary manslaughter
offenses." *Id.* at 713.

   Citing Supreme Court precedent, Judge Holmes noted that district judges have
greater leeway to disagree with particular Guidelines that are not based on "special
expertise, study, and national experience." *Id.* at 714.  The Guideline provision which
applied to Lente, on the other hand, was "carefully fashioned by the Commission while
engaged in its traditional work" and was based on "empirical data and national
experience." *Id.*  In particular, Judge Holmes noted that the Sentencing Commission had
extensively studied U.S.S.G. § 2A1.4 and made several recent changes to it.  In 2003, the

Commission amended the Guideline to increase the base offense level for reckless involuntary manslaughter offenses from 14 to 18 in order to "respond to a concern that the [Guidelines] did not adequately reflect the seriousness of involuntary manslaughter offenses." *Id.* In 2004, the Commission amended the Guideline again to add an alternative base offense level of 22 for involuntary manslaughter offenses involving the reckless operation of a means of transportation. *Id.* at 715. When the Commission has used its empirical tools to carefully craft a particular Guideline, "district courts should act with caution with electing to deviate from the Guidelines based upon policy disagreements with them." *Id.* (citing *United States v. Higdon*, 531 F.3d 561, 562 (7th Cir. 2008) ("As a matter of prudence . . . in recognition of the Commission's knowledge, experience, and staff resources, an individual judge should think long and hard before substituting his personal penal philosophy for that of the Commission.")).

Here, Judge Holmes concluded that the sentencing judge had "completely failed to establish the requisite nexus between its policy disagreement and Ms. Lente's sentence." *Id.* at 716. While the sentencing judge expressed dissatisfaction with imposing on Lente a sentence comparable to that received by aggravated-felon illegal reentry offenders and drug offenders, the judge "does not begin to explain how that general dissatisfaction provides the basis for the major-variance sentence that it imposed on Ms. Lente." *Id.*

Finally, Judge Holmes concluded by holding that all the above factors, taken together, could still not justify the extent of the variance. Based on the opinions of Judge Hartz and Judge Holmes, the Tenth Circuit panel voted to vacate the sentence and remand the case for resentencing before a different district judge.

The Sentencing Hearing.  On July 22, 2010, this Court held a sentencing hearing wherein it heard victim impact statements from the families of the victims.  In addition to the letters submitted by the victims' family members, the Court heard victim impact statements from:

- Jessica Murillo, the only surviving victim of the crash, who spoke about the devastating loss of her 12-year-old brother, Andres Murillo, and her 17-year-old boyfriend, Joshua Romero, as well as the emotional and physical trauma she has suffered since the night of the crash;

- Edwina and Charles Salazar, mother and step-father respectively of Jessica and Andres;

- Major Bruce Murillo, father of Jessica and Andres, who was serving on active duty with the New Mexico National Guard in Afghanistan when the crash occurred;

- Anthony and Victoria Romero, parents of Joshua (Victoria Romero attended the hearing but was too overcome to speak);

- Anthony and Mary Ann Tewahaftewa, parents of Anthony, the third victim to die in the crash, and grandparents of Kayley, Anthony's young daughter.

The victims' statements were extremely moving.  In fact, in the almost nine years that I have served as a federal judge, I have rarely heard such tragic and moving statements from victims. Words cannot describe the immeasurable loss these families have suffered and will continue to suffer for the rest of their lives.  The magnitude of this tragedy is also reflected in the victims' statements contained in the PSR and the correspondence received by the Court.

The Court also heard testimony from two defense witnesses: Dr. Elliott Rapoport, a licensed clinical psychologist, and Nelson Welch, a traffic accident reconstruction expert.  Dr.

Rapoport discussed Lente's background at length, including the fact that she had been physically and sexually abused as a child and that the two men with whom she had sustained serious romantic relationships had both committed suicide by the time Lente turned sixteen.  Dr. Rapoport's testimony focused on the fact that Lente suffered from a major depressive disorder for which she received no real treatment until she was incarcerated.  According to Dr. Rapoport, Lente's alcohol and marijuana problems (which began when Lente was sixteen) represented Lente's attempt to "self-medicate" or deal with her depression symptoms on her own.  Dr. Rapoport also testified that, in his opinion, Lente's depression could be successfully treated through medication.  Nelson Welch, the accident reconstruction expert, testified that it was possible that Lente's passenger, Anthony Tewahaftewa, had grabbed the steering wheel forcing Lente into the southbound lane, as Lente had initially stated.  Mr. Welch critiqued the methodology of a New Mexico State Police accident reconstruction report which had concluded that there was no evidence suggesting Tewahaftewa had grabbed the wheel.  He opined that the report, given its flawed methodology, was simply not useful.  However, Welch admitted that he could not state with any reasonable degree of certainty whether Tewahaftewa had grabbed the wheel or not.  Finally, the Court heard extensive oral argument from both the government and the Defendant.

## DISCUSSION

### I.     Legal Standard

After *United States v. Booker*, 543 U.S. 220 (2005), courts are no longer required to sentence defendants within the prescribed Guidelines range.  However, a district judge must still begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  *Gall v. United States*, 552 U.S. 38, 49 (2007).  "As a matter of administration and to secure

11

nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Id.* The initial calculation includes any upward or downward departures warranted under the Guidelines. After calculating the Guidelines range, the judge must give both sides the opportunity to argue that a Guidelines sentence is not appropriate—"perhaps because . . . the case at hand falls outside the 'heartland' to which the [Sentencing] Commission intends individual Guidelines to apply, perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338, 351 (2007) (internal citations omitted). If the judge decides to impose a sentence outside the Guidelines range, he must ensure that his justification for the variance is sufficiently compelling to support the degree of the variance. *Gall*, 552 U.S. at 50. The Supreme Court has declared it "uncontroversial that a major departure should be supported by a more significant justification than a minor one." *Id.* The need for a sufficient justification stems from the fact that the Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Id.* at 46.

Any sentence that the judge chooses to impose—whether its within the Guidelines range or not—must comport with the goals of sentencing as set forth in 18 U.S.C. § 3553(a). An appropriate sentence will: (a) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (b) afford adequate deterrence for criminal conduct; (c) protect the public from further crimes of the defendant; and (d) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). Furthermore, in determining whether a Guidelines sentence adequately serves these goals, the court should consider the following

factors: "(1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, . . . (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution." *Rita*, 551 U.S. at 347-48 (citing 18 U.S.C. § 3553(a)(1-7)). Finally, in all cases, the court must impose a sentence sufficient, but not greater than necessary to comply with the goals of sentencing. 18 U.S.C. § 3553(a).

## II.    Analysis

This case comes to this Court for resentencing on a clean slate. Because Judge Hartz and Judge Holmes were unable to reach a consensus regarding the reasons for remand, there is no Tenth Circuit majority opinion for this Court to follow and no individual opinion is binding on this Court. However, in analyzing what sentence would be appropriate for Lente to receive, this Court has carefully taken into account the opinions of all the Tenth Circuit panel members.

Guidelines Calculation. As discussed above, the first step in imposing a sentence is to correctly calculate the applicable Guidelines range. This Court accepts the 46 to 57 month Guidelines range calculated by the PSR. To arrive at this range, the PSR assigned a base offense level of 22 under U.S.S.G. § 2A1.4 for each of the three involuntary manslaughter convictions (Counts 1-3). For the assault resulting in serious bodily injury conviction (Count 4), the PSR computed a base offense level of 14 under U.S.S.G. § 2A2.2. Because Jessica Murillo's injuries could be characterized as "between serious bodily injury and permanent or life-threatening injury," the PSR adjusted Lente's offense level upward by six, resulting in an adjusted offense level of 20. The Guidelines' grouping rules assessed Lente an additional increment of sentencing culpability for each of her four victims. U.S.S.G. § 3D1.4. Accordingly, the PSR elevated Lente's highest offense level (which was 22) by four, resulting in a combined offense

13

level of 26.  After factoring in a three-level reduction for acceptance of responsibility, the PSR

ended in a total offense level of 23.  On the criminal history side, Lente's five prior tribal

convictions did not yield criminal history points under the Guidelines.  U.S.S.G. § 4A1.2(i).

Accordingly, the PSR placed Lente in criminal history category I.  An offense level of 23 plus a

criminal history category of I resulted in a Guidelines range of 46 to 57 months.  As noted

earlier, neither Defendant Lente nor the United States has ever objected to the PSR's Guidelines

calculation—either in the initial sentencing proceedings or the current proceedings.

        The Court notes, however, that upward departures are available under the Guidelines and

applicable to this case.  For example, under §4A1.3, the United States could have asked for an

upward departure based on the fact that Lente's criminal history category substantially under-

represented both the seriousness of her prior offenses as well as the likelihood that she would

commit other crimes.  While Lente had five previous tribal convictions (three as a juvenile and

two as an adult), none yielded any criminal history points that would elevate Lente's criminal

history category.  The Guidelines specifically state that an upward departure may be warranted

based on prior sentences not used in computing the defendant's criminal history category, such

as sentences imposed by tribal courts.  U.S.S.G. §4A1.3.  Had these tribal convictions occurred

in state or municipal courts, Lente would have received one additional point for each of her two

adult convictions.  In addition, Lente would have received two additional points under U.S.S.G.

4A1.1(d) for committing the instant offense while on probation for her previous assault and

battery conviction.  Consequently, Lente would have received four criminal history points,

putting her in criminal history category III.  An offense level of 23 combined with a criminal

history category of III results in an advisory sentencing range of 57 to 71 months.  Because the

PSR did not recommend such a departure and the United States did not request one, this Court

will not go out of its way to impose one.  However, as discussed in more detail below, Lente's

under-represented criminal history can form the basis for an upward variance.

Furthermore, an additional upward departure may have been available under § 5K2.1,

which permits the sentencing court to depart upward whenever the offense results in death.  This

Guideline provision notes that the court should consider the dangerousness of defendant's

conduct and whether multiple deaths resulted in deciding whether to depart upward.  Here, Lente

engaged in extraordinarily reckless conduct by drinking 13 to 19 beers and then, without a

license, driving on State Road 47.  Her conduct resulted in the deaths of three young men.  The

Court notes that § 5K2.1 has been used to depart upwards significantly in involuntary

manslaughter cases where the defendant drinks excessively, drives and kills multiple victims.

*See United States v. Merrival*, 176 F.3d 1079, 1081-82 (8th Cir. 1999) (affirming 12-level

upward departure under § 5K2.1).  Again, however, the Court will not go out of its way to

impose an upward departure where the PSR has not recommended one and the United States has

not requested one.

Finally, for purposes of arriving at Lente's Guidelines range, the Court agrees that Lente

should receive the benefit of the three-level reduction for acceptance of responsibility.[4]  Her

alleged initial attempt to deflect responsibility to her passenger notwithstanding, she did

eventually plead guilty to all charges.  Accordingly, this Court accepts the PSR's conclusion that

Lente's offense level stands at 23 and her criminal history at category I, resulting in an advisory

---

[4] In addition to accepting the three-level reduction of responsibility in the Guidelines
calculation, the Court has chosen not to vary upward on the ground that Lente initially attempted
to shift responsibility for the crash to her passenger.  Accordingly, the Court need not address the
testimony of Nelson Welch, the Defendant's accident reconstruction expert, because such
considerations did not factor into this Court's decision.

incarceration range of 46 to 57 months.

Sentencing Factors.  However, I conclude that a Guidelines sentence of 46 to 57 months is woefully inadequate to accomplish the goals of sentencing in this case.  In this instance, the Guidelines do not appropriately capture the seriousness of Lente's offense.  Furthermore, after carefully considering all the statutory factors set forth in 18 U.S.C. § 3553(a), I find that a sentence of 192 months is sufficient, but not greater than necessary to accomplish the goals of sentencing.  While this Court is not required to individually recite and consider all the 3553(a) factors on the record, *U.S. v. Contreras-Martinez*, 409 F.3d 1236, 1242 (10th Cir. 2005), I am cognizant of the fact that the sentence imposed represents a significant upward variance from the Guidelines range.  In an effort to fully and adequately support my upward variance, I will address each factor which played a role in my decision to vary upward.[5]

1. Underrepresented criminal history

First, I find that the Guidelines do not adequately represent Lente's prior criminal history.  As noted above, Lente did not receive any criminal history points for her five prior tribal convictions.  In four of the five offenses, tribal records show that Lente was intoxicated.  In all four, Lente was charged with disorderly conduct, among other things, for starting fights and/or causing property damage.  In the last offense, a conviction for assault and battery in 2005, details

---

[5] I also note that the testimony of Dr. Rapoport, the clinical psychologist who testified on behalf of Defendant at the sentencing hearing, did not give me any reason to mitigate Defendant's sentence.  Dr. Rapoport's testimony did not add much to the Defendant's personal background already contained in the PSR, except for his contention that her depression (and, accordingly, her alcoholism) could be treated successfully.  While I have no reason to doubt Dr. Rapoport's assessment, I do not believe this fact lessens Lente's culpability for her crimes nor does it detract from the horrific nature of the crimes.  Furthermore, I have no credible evidence suggesting that Lente is particularly amenable to treatment.  However, given Dr. Rapoport's assessment, I have recommended to the Bureau of Prisons that Lente undergo mental health treatment while she serves her sentence.

of the offense were unavailable.  Tribal records also show that Lente was arrested three additional times and charged with assault, assault and battery and/or disorderly conduct.  None of those three arrests led to convictions.  I find that Lente's criminal history shows a repeated willingness to abuse alcohol and engage in violent and/or reckless behavior.  While tribal convictions are not usually taken into account under the Guidelines (although, as noted above, the Guidelines themselves permit tribal convictions to be used as the basis for an upward departure), Lente's prior convictions *should* be taken into account in this case.  Five prior convictions (and three prior arrests which did not result in convictions) do not constitute an insignificant criminal record.  Furthermore, at least four of her five prior convictions involved the use of alcohol.  *All* of her prior convictions involve violent and/or reckless behavior.  These prior convictions show a pattern of alcohol abuse and reckless behavior—a pattern which led to Lente's decision to drink 13 to 19 beers on December 2, 2005 and drive on State Road 47.  I recognize that three of Lente's prior convictions occurred when she was a juvenile and, accordingly, I do not rely on these convictions to enhance Lente's sentence.  However, I find it entirely appropriate to enhance Lente's sentence on the basis of her two adult tribal convictions—one for assault and battery and one for disorderly conduct.  As discussed above, had Lente's two adult tribal convictions occurred in state or municipal court, Lente would have been placed in criminal history category III and would be facing a Guidelines range of 57 to 71 months—over a year more than the Guidelines range she faces today.  Given the patterns in Lente's offense history, I find it highly unjust that she avoids the consequence of these prior convictions merely because they occurred in tribal court.

2. Failure of Guidelines to adequately take into account each additional victim

        Second, and perhaps most importantly, I find that the Guidelines do not adequately take

into account the fact that Lente's offense resulted in multiple deaths.  Under the Guidelines'
grouping rules, Lente was assessed only one additional increment of sentencing culpability for
each of the three victims who died, as well as an additional increment for the victim who
sustained serious bodily injuries.  U.S.S.G. § 3D1.4.  In accordance with these rules, the bottom
end of Lente's sentencing range was increased by 5-6 months for each of her four victims.  I find
it difficult to believe that 5 or 6 months adequately represents the value of each of these young
lives—particularly the three who died.[6]  I recognize that Lente did not intend to kill these
victims, but she certainly intended to drink alcohol and drive while intoxicated.  By her actions,
she recklessly endangered four lives and ultimately killed three.  By choosing to drive on a major
road after consuming 13 to 19 beers, Lente assumed the risk that her actions would result in
multiple deaths.  The Defendant should have to bear the full cost of recklessly taking the lives of
18-year-old Anthony Tewahaftewa, 17-year-old Joshua Romero and 12-year-old Andres
Murillo.

   In finding that the Guidelines inadequately represent the value of these lives, I do not
find that the Guidelines *categorically* do so.  In cases with only one victim, the Guidelines may
set forth an appropriate sentencing range.  Furthermore, in cases where the victim or victims
share some minor culpability—either because they themselves were intoxicated or because they

---

[6] In no way do I intend to minimize the serious physical and emotional injuries suffered
by Jessica Murillo.  While Ms. Murillo managed to survive the crash, she has permanent injuries
that will most likely cause her pain for the rest of her life.  She suffers from constant back, knee
and joint pain.  Ms. Murillo loves dance and, prior to the crash, intended to minor in dance at
college.  Now, Ms. Murillo's disability and permanent pain make dancing difficult. However,
Lente's base offense level has already been elevated by six levels under the Guidelines because
of the gravity of Ms. Murillo's injuries.  A six-level enhancement is entirely appropriate given
the seriousness and permanence of Ms. Murillo's injuries.  I am more concerned, however, with
the comparatively miserly enhancement awarded by the Guidelines for each of the three victims
who were killed.

willfully rode in a car with an intoxicated driver—the Guidelines may be adequate.  But in cases such as this where there are multiple victims who are entirely blameless, the Guidelines do not sufficiently enhance a defendant's sentence for these additional victims.  As noted earlier, the Guidelines provide a partial solution to this inadequacy by permitting a sentencing court to impose a substantial upward departure whenever the offense results in death—particularly when the offense results in multiple deaths or when the defendant's conduct is highly dangerous.  *See* U.S.S.G. § 5K2.1.  Here, Lente's undeniably reckless conduct resulted in three deaths.  If multiple deaths can justify an upward departure within the framework of the Guidelines, they can certainly justify an upward variance.

Finally, the United States has proffered data showing the rarity of drunk driving offenses which result in three deaths.  According to statistics compiled by the New Mexico Department of Transportation, there were a total of 167 crashes involving alcohol which led to a fatality in 2005.  *See* NMDOT Driving While Impaired, New Mexico 2005, at 6.  The total number of fatalities in these 167 crashes was 194.  *See id.*  Thus, in New Mexico in 2005, the average number of fatalities per drunk-driving related crash was 1.16.  In this case, however, the Defendant killed almost three times as many people as the average, as well as seriously injured another.  These statistics help show the tragic nature of this particular crash.  Further, they help illustrate why the 5-6 month enhancement provided by the Guidelines for each victim insufficiently represents the unusual violence of this crime.

3. <u>Presence of additional factors demonstrating extreme recklessness</u>

Third, there are additional factors present in this case which demonstrate Lente's extraordinary recklessness and show why this case is outside the "heartland" of cases contemplated by the Guidelines.  For example, Lente's blood alcohol content ("BAC") two

19

hours after the accident was 0.21—over two-and-a-half times the New Mexico legal limit of 0.8. Such an excessively high blood alcohol level is unusual—even in drunk driving cases.  In 2005, the mean BAC for drunk drivers in New Mexico was 0.16.  *See* NMDOT Driving While Impaired, New Mexico 2005.  *See also* Nat'l Ctr. for Statistics & Analysis, Nat'l Hwy Traffic Safety Admin, 2007 Traffic Safety Annual Assessment (noting that the median blood alcohol content of a driver involved in an alcohol impaired driving fatality was 0.16%).  Lente's BAC was significantly over the statewide average.

In addition, Lente has never held a valid New Mexico driver's license.  While I acknowledge that the lack of a driver's license does not necessarily correlate with a lack of driving experience, it certainly suggests that Lente has never had any formal driving training.  It also demonstrates Lente's further disregard for the law.  Not only did Lente choose to drink excessively and then drive on State Road 47 in her mother's Suburban, but she chose to do so without being licensed to drive.  The State of New Mexico imposes licensing requirements for good reasons—not the least of which is to ensure that its drivers are sufficiently trained.  New Mexico also requires its drivers license applicants to take a DWI awareness course which ensures that its drivers appreciate the dangers of driving while intoxicated.  Lente was 22 years old at the time of the crash.  New Mexico permits its drivers to become fully licensed by age sixteen and six months.  If Lente had wanted to apply for a license in order to drive legally, I see no reason why she could not have obtained a valid license.

Finally, I note that the Isleta Indian Pueblo, where the crash occurred, is not located in a remote area of New Mexico.  Neither is State Road 47 an infrequently traveled road.  The Isleta Pueblo is located approximately twelve miles outside the city of Albuquerque—the largest city

in New Mexico where approximately one-third of the State's population resides.[7]  The Pueblo is easily accessible from Interstate 25 and only miles away from the intersection of Interstate 25 and Interstate 40—the two major highways in the State of New Mexico.  State Road 47 is a highway which runs parallel to Interstate 25 and, at one point, intersects it.  Just north of this intersection, State Road 47 becomes Broadway Boulevard, one of the major streets in downtown Albuquerque and approximately four blocks from the U.S. Courthouse.  State Road 47 is also the road used to access the Isleta Pueblo's resort hotel, casino and golf course.  New Mexico residents who live in Los Lunas or Belen often use State Road 47 to commute to Albuquerque, as an alternative to taking I-25.  Lente, who has lived in the area her entire life, is no doubt well aware of the regular traffic on State Road 47 as well as its proximity to the Albuquerque metropolitan area.  Yet, despite this, she still chose to drive while highly intoxicated on this well-traveled road.

4. Sentencing goals

Finally, I find that a Guidelines sentence of 46 to 57 months does not begin to achieve the goals of sentencing set forth in 18 U.S.C. § 3553.  Most importantly, for all the reasons discussed above, a Guidelines sentence does not reflect the seriousness of the offense.  Furthermore, a Guidelines sentence would not adequately deter Lente from future criminal conduct nor protect the public from future crimes by Lente.  Lente's criminal history shows a repeated willingness to drink to excess and engage in reckless behavior, often endangering the safety of others.  Despite multiple terms of imprisonment by tribal authorities and five separate terms of probation, Lente has continued to engage in such reckless behavior.  I find that a

---

[7] The Court takes judicial notice of the geographic data contained on the Isleta Pueblo's website as well as Google maps of the Isleta Pueblo and surrounding areas.

substantial sentence is necessary to deter Lente from future offenses and to protect the public.[8]

      Sentence.  For these reasons, I find that a sentence of 192 months is sufficient, but not greater than necessary, to comport with the goals of sentencing.  In arriving at a sentence of 192 months, I first impose a term of 72 months for each of the involuntary manslaughter counts.  Seventy-two months, or six years, is the statutory maximum for involuntary manslaughter.  The 72-month terms imposed for Count I (relating to Joshua Romero) and Count II (relating to Andres Murillo) shall run consecutively for a total of 144 months or 12 years.  The 72-month term for Count III (relating to Anthony Tewahaftewa) shall run partially consecutive and partially concurrent.[9]  Specifically, 48 months of that term shall run consecutive while the remaining 24 months shall run concurrent.  In addition, I impose a term of 120 months, or 10 years, for the assault on Jessica Murillo resulting in serious bodily injury.  That 120-month term shall run concurrent.  Consequently, I impose a sentence of 192 months' imprisonment, or 16 years, for Lente's offenses.

---

    [8] I also note that the Defendant would unquestionably benefit from the educational and vocational training provided by the Bureau of Prisons.  Lente briefly attended high school in Albuquerque, New Mexico, where she completed zero credits and left with a 0.0 grade point average.  Furthermore, she has been employed for a total of only 85 days in her life.  I have decided not to rest my upward variance on this ground, however, because it is unclear whether a within-Guidelines sentence would be sufficient to provide Defendant with the educational and vocational training she clearly needs.

    [9] By running the sentence for Count III partially concurrent, I do not intend to minimize the loss of Anthony Tewahaftewa or the impact his death has had on his surviving family members.  Moreover, there is no doubt that Mr. Tewahaftewa was the victim of involuntary manslaughter at the hands of Defendant.  However, the PSR indicates that Mr. Tewahaftewa, after choosing to consume alcohol with the Defendant, chose to ride in the vehicle driven by Defendant.  To some degree, then, Mr. Tewahaftewa engaged in risky behavior.  The other three victims, on the other hand, did not engage in any risky behavior whatsoever and, tragically, just happened to be at the wrong place at the wrong time.

Finally, the terms and conditions of supervised release and amounts of restitution will be set forth in the Judgment and Commitment order which will be filed subsequently in this case.

**SO ORDERED.**

_____
UNITED STATES DISTRICT JUDGE