## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO
_____

UNITED STATES OF AMERICA,

                Plaintiff,

    V.                                    Case No. 05-CR- 2770 WJ

CAMILLE SUZANNE LENTE,

                Defendant.


## MEMORANDUM OPINION AND ORDER ON THE RESENTENCING OF DEFENDANT

Following a horrific drunk driving vehicular crash resulting in three deaths and one surviving victim with serious life-altering injuries, Defendant Camille Lente, the other crash survivor, pled guilty to three counts of involuntary manslaughter and one count of assault resulting in serious bodily injury.  While the Defendant's advisory sentencing Guidelines range calculated under the U.S. Sentencing Guidelines called for a sentence of 46 to 57 months, the District Court sentenced Defendant to 216 months' imprisonment, which was 159 months above the upper end of the Guidelines range.  On appeal, a divided panel of the Tenth Circuit vacated Defendant's sentence and remanded to this Court for resentencing.[1]  This Court varied upwards from the Guidelines and sentenced Defendant to a term of 192 months' imprisonment. Defendant again appealed, and the Tenth Circuit again vacated the sentence and remanded to this Court for resentencing.  Having considered all the factual and legal matters presented in the

_____

[1] Although the first three judge panel of the Tenth Circuit was divided, two judges determined that the United States had breached the plea agreement, thereby requiring the case to be randomly reassigned to another district judge in accordance with Tenth Circuit precedent.  *United States v. Lente*, 323 Fed. App'x. 698, 699 (10th Cir. 2009) (remand to different judge); *see United States v. Brye*, 146 F.3d 1207, 1213 (10th Cir. 1998) (where government's breach of plea agreement was not egregious or intentional, appeals court will remand only for resentencing by a different judge).

extensive record before this Court, as well as the arguments presented at the hearing on November 2, 2012, this Court varies upward from the Guidelines and sentences Defendant to a term of 192 months' imprisonment.

## FACTUAL BACKGROUND

On December 2, 2005, after consuming excessive amounts of alcohol, Defendant drove her mother's Chevrolet Suburban on New Mexico State Road 47 within the exterior boundaries of the Isleta Indian Reservation in New Mexico.  Anthony Tewahaftewa, a friend of Defendant's, was riding in the front passenger seat.  At approximately 10:40 p.m., Defendant, who was traveling northbound, swerved across the center line of the highway and crossed into the southbound traffic lane.  She collided with a Ford Ranger pickup truck driven by Jessica Murillo.  Ms. Murillo was driving her 12-year-old brother, Andres Murillo, and her 17-year-old boyfriend, Joshua Romero, back from Albuquerque where the three had gone to see a movie.  Anthony Tewahaftewa, Andres Murillo and Joshua Romero all died immediately on impact.  The autopsy reports for the three deceased victims indicate that all three died of severe, multiple blunt force injuries sustained during the crash.  Jessica Murillo survived, but sustained fractures to her right femur, right shoulder, and right ankle, and received numerous facial lacerations.  In the intervening months, Ms. Murillo underwent many hours of physical therapy just so she could walk again.  Defendant suffered two broken ankles and a dislocated hip.  Immediately after the accident, both Jessica Murillo and Defendant were transported to the University of New Mexico Hospital.

Two hours after the accident, hospital workers took a blood sample from Defendant.  The blood sample test results showed a blood alcohol level of 0.21—over two and one-half times the New Mexico legal limit of 0.8.  In addition, the test revealed that Defendant had marijuana

present in her system.  In subsequent interviews with agents from the Bureau of Indian Affairs,

Defendant admitted to drinking between 13 and 19 beers before the crash.  Finally, the agents

discovered that Defendant had never held a valid New Mexico drivers' license and that the

Surburban she was driving was not insured.

## PROCEDURAL BACKGROUND

The extensive procedural background to this case, including the divided panel of the

Tenth Circuit Court of Appeals that first vacated and remanded to this Court for resentencing,

was described thoroughly in this Court's previous Amended Memorandum and Order (**doc. 97**).

Accordingly, only pertinent details referenced in this Court's previous order shall be herein

restated.

Second Tenth Circuit Appeal.  On Defendant's second appeal, a second panel of the

Tenth Circuit Court of Appeals again vacated the sentence and remanded to this Court for

resentencing.  *United States v. Lente*, 647 F.3d 1021 (10th Cir. 2011) (*Lente II*).  The Circuit

concluded that the District Court had committed two procedural errors, in (1) failing to address

Defendant's argument that the difference between her sentence and those of similar offenses and

offenders created unwarranted disparities, and (2) failing to address Defendant's argument that

circumstances immediately before the crash weighed against a finding that she was acting with

excessive recklessness.  However, the Tenth Circuit found no procedural error in this Court's

decision to consider the nature of the road on which Defendant was driving at the time of the

accident as part of the circumstances of the offense.

Although the Circuit noted that "the procedural error regarding the district court's failure

to address Ms. Lente's mitigating-circumstances argument may have been harmless," it

concluded that the District Court's failure to consider Defendant's sentencing disparity argument

required reversal, for two reasons.  *Id.* at 1038.  First, considering that argument "might have convinced the court to reach a different sentence."  *Id.*  Second, failing to consider the argument prevented the Circuit from engaging in meaningful appellate review.  The Circuit expressly declined to address the merits of Defendant's sentencing disparity argument, noting "[t]hat is for the district court to resolve in the first instance and for this court to consider on substantive reasonableness review."  *Id.* at 1034.  Because the Circuit concluded Defendant's sentence failed on procedural grounds, it did not address the sentence's substantive reasonableness.  *Id.* at 1030 (citing *United States v. Cerno*, 529 F.3d 926, 937 (10th Cir.2008)).

 <u>Sentencing Hearing</u>.  On November 2, 2012, this Court held a sentencing hearing wherein it heard oral argument from both parties.[2]  In addition, the Government offered evidence of Defendant's behavior while incarcerated.

## DISCUSSION

### I. Legal Standard

 After *United States v. Booker*, 543 U.S. 220 (2005), district courts are no longer required to sentence defendants within the prescribed United States Sentencing Guidelines range.  However, a district judge must still begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  *Gall v. United States*, 552 U.S. 38, 49 (2007).  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  *Id.*  The initial calculation includes any upward or downward departures warranted under the Guidelines.  After calculating the Guidelines range, the judge must give both sides the opportunity to argue that a Guidelines sentence is not appropriate— "perhaps because . . . the case at hand falls outside the 'heartland' to which the [Sentencing]

---

[2] The mandate from Defendant's second appeal issued on August 22, 2011, affording Defendant and the Government ample time to conduct further discovery and to extensively brief  the issues related to the resentencing of Defendant.

Commission intends individual Guidelines to apply, perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338, 351 (2007) (internal citations omitted). A judge who decides to impose a sentence outside the Guidelines range must ensure that justification for the variance is sufficiently compelling to support the degree of the variance. *Gall*, 552 U.S. at 50. The Supreme Court has declared it "uncontroversial that a major departure should be supported by a more significant justification than a minor one." *Id.* The need for a sufficient justification stems from the fact that the Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Id.* at 46.

Any sentence that the judge chooses to impose—whether it is within the Guidelines range or not—must comport with the goals of sentencing as set forth in 18 U.S.C. § 3553(a). An appropriate sentence will: (a) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (b) afford adequate deterrence for criminal conduct; (c) protect the public from further crimes of the defendant; and (d) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). Furthermore, in determining whether a Guidelines sentence adequately serves these goals, the court should consider the following factors: "(1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, . . . (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution." *Rita*, 551 U.S. at 347-48 (citing 18 U.S.C. § 3553(a)(1-7)). Finally, in all cases, the court must impose a sentence sufficient, but not greater than necessary to comply

with the goals of sentencing.  18 U.S.C. § 3553(a).

## II.    Analysis

As noted above, the Tenth Circuit in *Lente II* did not address the substantive reasonableness of this Court's sentence of 192 months.  Instead, it remanded for this Court to redress procedural errors.  Hence, this order incorporates the legal analysis found in the previous Amended Memorandum and Order, and focuses primarily on the two errors identified by the Tenth Circuit.

Guidelines Calculation. As discussed above, the first step in imposing a sentence is to correctly calculate the applicable Guidelines range.  The details of this Court's calculations appear in the previous memorandum opinion and order in this case and have not changed.[3]  To summarize, this Court accepts the PSR's conclusion that Defendant's offense level stands at 23 and her criminal history at category I, resulting in an advisory incarceration range of 46 to 57 months.

Sentencing Factors. However, I remain convinced that a Guidelines sentence of 46 to 57 months is woefully inadequate to accomplish the goals of sentencing in this case.  Simply stated, the Guidelines do not appropriately capture the seriousness of Defendant's offenses.  Furthermore, after carefully considering all the statutory factors set forth in 18 U.S.C. § 3553(a), I find that a sentence of 192 months is sufficient, but not greater than necessary to accomplish the goals of sentencing.  In an effort to fully and adequately support my upward variance, I will address each factor which played a role in my decision to vary upward.[4]

---

[3] Neither Defendant nor the Government has ever challenged the Guidelines calculation, and the Tenth Circuit in *Lente II* did not address the Guidelines calculation.

[4] I also note that the testimony of Dr. Elliot Rapoport, the clinical psychologist who testified on behalf of Defendant at the July 22, 2010, sentencing hearing, did not give me any reason to mitigate Defendant's sentence.  Dr. Rapoport's testimony did not add much to the Defendant's personal background already contained in the PSR, except for his contention that her depression (and, accordingly, her alcoholism) could be treated successfully.  Notwithstanding Dr. Rapoport's assessment, I do not believe this fact lessens Lente's culpability for her crimes nor

1.  <u>Conclusions Adopted from Previous Order</u>

First, for the reasons addressed in my previous Order, I find that the Guidelines do not adequately represent Defendant's prior criminal history, which shows a repeated willingness to abuse alcohol and engage in violent and/or reckless behavior.  Additionally, the Government has provided details of an adult tribal court conviction for disorderly conduct not previously considered.  In May 2003, Defendant's mother called the Isleta Tribal Police when Defendant came to her house intoxicated and became verbally abusive.  This conviction merely affirms Defendant's continuing problems with engaging in reckless behavior as a result of alcohol abuse.

Second, and perhaps most importantly, for the reasons stated in the previous Order, I find that the Guidelines do not adequately take into account the fact that Defendant's offense resulted in multiple deaths.  In accordance with Guidelines rules, the bottom end of Defendant's sentencing range was increased by 5-6 months for each of her four victims, an insufficient amount to adequately represent the value of each of these young lives—particularly the three who died.

In focusing on these victims, in no way do I intend to minimize the serious physical and emotional injuries suffered by Jessica Murillo.  While Ms. Murillo managed to survive the crash, she has permanent injuries that will most likely cause her pain for the rest of her life.  She suffers from constant back, knee and joint pain.  Ms. Murillo loves dance and, prior to the crash, intended to minor in dance at college.  Now, Ms. Murillo's disability and permanent pain make dancing difficult.  However, Defendant's base offense level has already been appropriately elevated by six levels under the Guidelines because of the seriousness and permanence of Ms.

---

does it detract from the horrific nature of the crimes.  Furthermore, evidence of Defendant's behavior while incarcerated, discussed in more detail below, does not suggest particular amenability to treatment..  However, given Dr. Rapoport's assessment, I have recommended to the Bureau of Prisons that Lente undergo mental health treatment as well as substance abuse treatment while she serves her sentence.

Murillo's injuries.  In contrast, the Guidelines award only comparatively miserly enhancement for each of the three victims who were killed.  In cases with only one victim, or where the victim or victims share some minor culpability—either because they themselves were intoxicated or because they willfully rode in a car with an intoxicated driver—the Guidelines may be adequate.  But in cases such as this where there are multiple victims who are entirely blameless, and sadly just happened to be in the wrong place at the wrong time, the Guidelines do not sufficiently enhance a defendant's sentence for these additional victims.

Further, drunk driving offenses resulting in three deaths are rare; in New Mexico in 2005, the average number of fatalities per drunk-driving related crash was 1.16.  *See* NMDOT Driving While Impaired, New Mexico 2005, at 6.  These statistics help show the tragic nature of this particular crash, and help illustrate why the 5-6 month enhancement provided by the Guidelines for each victim insufficiently represents the unusual violence of Defendant's crimes.

Third, as explained in more detail in this Court's previous Memorandum and Order, additional factors in this case demonstrate Defendant's extraordinary recklessness and show why this case is outside the "heartland" of cases contemplated by the Guidelines.  Defendant's blood alcohol content ("BAC") two hours after the accident was 0.21—over two-and-a-half times the New Mexico legal limit of 0.8, and significantly over the statewide average for drunk driving cases.[5]  Further, Defendant has never held a valid New Mexico driver's license, which both suggests that she has never had any formal driving training and demonstrates her further disregard for the law.

Finally, Defendant chose to drive on State Road 47.  As noted above, the Tenth Circuit found no procedural error in this Court taking judicial notice of the locations and characteristics

---

[5] In this round of the proceedings, Defendant and the Government disagree about whether Defendant's BAC had been increasing or decreasing when it was tested, and therefore whether it was higher or lower than 0.21 at the time of the crash.  The Court reaches no conclusions about Defendant's BAC at the time of the accident.  Rather, I rest the upward variance only on the fact that Defendant chose to drive on an evening when she had been drinking sufficiently to reach a BAC of 0.21.

of the road where the accident occurred, although it wrote that "more specific information about traffic congestion at the time and place of the accident may have been more probative." *Lente II* at 1037.[6]  In addition to the characteristics of State Road 47 addressed in this Court's previous Memorandum and Order, I note that the New Mexico Department of Transportation ("NMDOT") characterizes State Road 47 as an "Urban Principal Arterial-Other" roadway, or a road "identified as unusually significant to its surrounding area in terms of the nature and composition of travel it serves."  Such roads serve major metropolitan centers; carry a high proportion of the total urban area travel, including trips entering and leaving the area, and drivers wishing to bypass the city; serve significant intra-area travel; and provide continuity for rural arterial roads intercepting the urban boundary.  NMDOT data shows that on December 5 and 6, 2006, the same time of year that this accident occurred, between 500 and 600 vehicles traveled the pertinent section of State Road 47 between 10:00 p.m. and 11:00 p.m.  As a life-long resident of the area, Defendant was no doubt  aware of the regular traffic on State Road 47, as well as its proximity to the Albuquerque metropolitan area.  Yet, despite this, she still chose to drive while highly intoxicated on this well-traveled road.  That more cars travel New Mexico's interstates or Albuquerque's major thoroughfares does not make Defendant's choice to drive State Road 47 while highly intoxicated less reckless.

    2.  <u>New Conclusions</u>

<u>Lack of mitigating factors</u>.  This Court finds that the circumstances leading up to the crash were insufficient to alter its previous conclusion that Defendant acted with extreme recklessness.

---

[6] The Court takes judicial notice of the geographic data contained on the Isleta Pueblo's website as well as Google maps of the Isleta Pueblo and surrounding areas.

Whether Defendant's Mother Told Her to Drive Tewaheftewa Home.  In *Lente II*, the Tenth Circuit noted that Defendant had introduced undisputed evidence that before the accident, when she and Tewahaftewa joined her mother at Elaine Jojola's home (1) Tewahaftewa was drunk and behaving inappropriately; (2) Defendant's mother and Jojola tried to convince him to leave, but failed; (3) Jojola called Tewaheftewa's sister and asked her to come get him, but the sister refused; and (4) Defendant's mother then gave Defendant to keys to her car and told Defendant to drive him home.  *Lente II*, at 1024.  Defendant asserts that these facts mitigate her recklessness in choosing to drive, because she was simply following her mother's wishes.

For this resentencing, the Government has offered evidence contesting that account of events.  Relying on interviews with Jojola and her two sons, the Government contends that (1) Defendant wanted to leave in her mother's vehicle, but initially her mother would not let her; (2) her mother had told Defendant that she and Tewaheftewa were drunk; (3) at one point Defendant's mother told her she would drive the two of them home, but later changed her mind; (4) Defendant insisted that she wanted to drive and tried to get the keys from her mother; (5) her mother only relinquished the car keys after Defendant chased her around the car and threatened her; and (6) Defendant was angry and cursing at her mother.[7]  Defendant argues that under the law of the case doctrine, this Court cannot consider the Government's additional evidence, and is restricted to the facts that Tenth Circuit outlined and described as "undisputed" in *Lente II*.

On remand, resentencing is conducted de novo, unless the Tenth Circuit's mandate limits the District Court's discretion.  *United States v. Keifer*, 198 F.3d 798, 801 (10th Cir. 1999) ("Resentencing on remand is typically de novo, but an appellate court may limit the district court's discretion pursuant to the mandate rule.").  De novo review allows this Court to consider

---

[7] Defendant's own statements confirm that her mother initially took the keys away from her, and that she argued with her mother, yelling and cursing at her.

additional evidence.  *See United States v. Moore*, 83 F.3d 1231 (10th Cir.1996) ("[W]hen a

defendant's sentence is vacated on appeal and remanded for new sentencing, the lower court

must begin anew with de novo proceedings . . . . [which] 'permits the receipt of any relevant

evidence the court could have heard at the first sentencing hearing.'" (quoting *United States v.

Ortiz*, 25 F.3d 934, 935 (10th Cir.1994)).  "As a consequence, the court on remand has the

discretion to entertain evidence that could have been presented at the original sentencing even on

issues that were not the specific subject of the remand."  *Moore*, 83 F.3d at 1234.  The Tenth

Circuit has expressly rejected case law holding to the contrary.  *See Keifer*, 198 F.3d at 801

(rejecting *United States v. Torres*, 182 F.3d 1156, 1164 (10th Cir.1999), which had held that

"resentencing does not invite an open season for the government to make the record that it failed

to make in the first instance.").

     The law of the case doctrine holds that "'when a court decides upon a rule of law, that

decision should continue to govern the same issues in subsequent stages in the same case.'"

*United States v. Monsisvais*, 946 F.2d 114, 115 (10th Cir. 1991) (quoting *Arizona v. California*,

460 U.S. 605, 618 (1983)).  Similarly, "a decision of an appellate tribunal on a particular issue,

unless vacated or set aside, governs the issue during all subsequent stages of the litigation in the

nisi prius court, and thereafter on any further appeal."  *Id.* at 115-16.  Here, the Tenth Circuit's

mandate required remand and resentencing "consistent with this opinion" and did not limit this

Court's consideration of additional evidence.  Further, the Tenth Circuit's characterization of

Defendant's account of the circumstances leading up to the crash as "undisputed facts" is not a

legal ruling or factual finding to which this Court is bound by the law of the case doctrine.

Rather, it describes the record as it stood at that point in the proceedings.

Therefore, this Court has considered all evidence on the circumstances leading up to the crash, and finds no mitigation of Defendant's extreme recklessness. Accounts of what happened at the Jojola residence before Defendant and Tewaheftewa left conflict, and both sides have motive to distort the picture.[8]  Nonetheless, all accounts agree that Defendant's mother initially took the keys from Defendant, and that Defendant and her mother argued before Defendant left. Defendant's criminal history, which includes her mother calling the tribal police to address Defendant's drunken behavior, makes clear Defendant's willingness to contest her mother's wishes. Further, the choice to drive after drinking 13 to 19 beers ultimately lay with Defendant, regardless of who handed her the keys. Therefore, I find that the circumstances of Defendant's mother handing her the keys do not mitigate Defendant's extreme recklessness.

        <u>Whether Tewaheftewa Caused the Accident by Grabbing the Steering Wheel</u>.  Defendant next argues that Tewahaftewa's role in the accident weighs against finding that she acted with extreme recklessness. This Court disagrees.

        The issue of Tewaheftewa's actions in the moments before the crash has a convoluted history in this case. When medical personnel treated Defendant's injuries at the scene, she repeatedly said, "Why did he do that? Why did he do that?" and when interviewed on December 3 and December 5, 2005, she variously described Tewaheftewa as having "pulled," "grabbed," and "pushed" the steering wheel. After entering into her plea agreement on July 19, 2006, Defendant submitted a written statement accepting responsibility for her actions and their consequences, and received a three-level reduction for that acceptance. Nonetheless, in

---

[8] Defendant contends that the Jojola interviews, on which the Government relies, are unreliable because the Jojola family was upset about Tewaheftewa's death, and therefore inclined to blame Defendant. Defendant argues that her mother's testimony that Defendant "was not that much intoxicated" and that "I [should] have [had] better judgment than to give her the keys" is more reliable because her mother could have minimized her own role in the accident by describing the Defendant as forcibly taking the keys, but did not. However, Defendant's mother presumably also had an incentive to downplay her daughter's intoxication and actions, in the hope of minimizing her culpability.

imposing the first sentence, Senior U.S. District Judge John E. Conway justified his upward departure in part because Defendant "attempted to shift some of the blame to her passenger by reporting he tried to grab the steering wheel while they were traveling.  The accident reconstruction report stated there was no evidence to suggest that this happened."  In *Lente I*, two judges on the panel agreed that "[t]he government cannot stipulate in the plea agreement that a defendant is entitled to a guidelines reduction in offense level for acceptance of responsibility and then endorse a presentence-report recommendation that the court vary upward because of the defendant's failure to accept responsibility."  *Lente I*, slip op. at 3 (Hartz, J., concurring). Consequently, on remand for resentencing, this Court did not consider whether or not Tewaheftewa interfered with Defendant's driving.

Here, however, the issue of Tewaheftewa's behavior arises not as a factor in Defendant's willingness to take responsibility, but as a possible mitigating factor for her own recklessness. At the July 22, 2010 hearing, accident reconstruction expert Nelson Welch testified that the evidence he reviewed was consistent with Tewaheftewa grabbing the steering wheel, and Defendant pulling the steering wheel away from him and overcorrecting, leading her to drive into the other lane of traffic.  Defendant argues that this evidence "would considerably lessen . . . [her] responsibility for the accident and strongly counter the notion that [she] was extremely reckless."  Conversely, the Government offers a report by New Mexico State Police accident reconstructionistsSergeant Ed Garcia and Office Lauren Milligen suggesting that Tewaheftewa did not interfere with the steering wheel.  (**Doc. 123-6.**)

However, whether Tewaheftewa grabbed the steering wheel does not mitigate Defendant's own recklessness, which derives not from small actions undertaken immediately before the crash, but from her choice to drive at all after consuming 13 to 19 beers.  Further, she

13

chose to drive Tewaheftewa home despite knowing that he, too, was drunk, that he had been acting boisterously and irrationally before getting into the car,[9] and that she was too intoxicated to be able to respond effectively to unexpected interference with her driving.  Thus, I find that any action undertaken by Tewaheftewa fails to mitigate Defendant's recklessness.

Sentencing Goals

Finally, I find that a Guidelines sentence of 46 to 57 months does not begin to achieve the goals of sentencing set forth in 18 U.S.C. § 3553.  Most importantly, for all the reasons discussed above and in the previous Memorandum Opinion and Order, a Guidelines sentence does not reflect the seriousness of the offenses Defendant committed.

Deterrence and Protection of the Public.  Furthermore, a Guidelines sentence would not adequately deter Defendant from future criminal conduct nor protect the public from future crimes by her.  Defendant's criminal history shows a repeated willingness to drink to excess and engage in reckless behavior, often endangering the safety of others.  Despite multiple terms of imprisonment by tribal authorities and five separate terms of probation, Defendant has continued to engage in such reckless behavior, including during her current term of incarceration.

In *Pepper v. United States*, the United States Supreme Court held that where a sentence has been overturned and the defendant reappears before the district court for sentencing, the district court can consider post-conviction conduct.  131 S. Ct. 1229, 1239-49 (2011).  The Court explained that the federal sentencing framework requires a sentencing judge to treat each convicted person as an individual, considering the widest range of information possible.  In light of that framework, the Court concluded, "we think it clear that when a defendant's sentence has been set aside on appeal and his case remanded for resentencing, a district court may consider

---

[9] Defendant emphasizes that during the time Tewaheftewa spent at Jojola's house he was "boisterous and unpredictable, jumping, hugging and kissing [Jojola] one moment, and talking belligerently about gangs," that he was "agitated" and "demanding," and his behavior was "uncontrollable."

evidence of a defendant's rehabilitation since his prior sentencing." *Id.* at 1241. The Court noted that such evidence was particularly pertinent to assessing the need to protect the public, deter future crime, and provide rehabilitation. *Id.* at 1242 (citing *United States v. McMannus*, 496 F.3d 846, 853 (8th Cir. 2007) (Melloy, J., concurring) ("In assessing ... deterrence, protection of the public, and rehabilitation, 18 U.S.C. § 3553(a)(2)(B)(C) & (D), there would seem to be no better evidence than a defendant's post-incarceration conduct.")).

Here, Defendant's post-conviction conduct shows that she remains a danger to the public and her likelihood of reoffending is high. While detained at Torrance County Detention Center ("TCDC"), Defendant made a number of statements on recorded phone calls about her continued use of drugs and intent to continue using drugs and drinking. On October 2, 2011, she told her grandmother that she had been in lockdown because "I got high . . . . Not on weed or cocaine or anything. . . . It was . . . Oxycontin and morphine. So yeah, I was high, yeah." On November 3, 2011, she told her mother that "you guys need to let me stop drinking until I fucking come home. I want to see you guys, and then we'll get all fucked up." She also said that if she "got all fucked up," she would "just sit there and cry," because when she was in prison, "I got all fucked up. We drank some hooch, and I just fucking cried a little bit, said 'I miss my son,' and I went to sleep." On November 5, 2011, Defendant again spoke with her mother. During this conversation, Defendant's mother was describing her own pain medications, and Defendant asked her, "Do you know what Neurontin is? . . . It's a muscle relaxer sort of thing. . . . I used to like them – in prison." Later, when Defendant's mother was describing the Oxycontin pills a friend had given her, Defendant asked, "What milligram was it? . . . What color was it? Yellow or pink and white?" and when her mother answered, "Pink," Defendant said, "Oh, it was a 20. . . . I like them. . . . Before I came back from prison this last time, I already think I was doing like two of –

two 40s a day. . . .  And 60 milligrams of morphine."  Although Defendant had been prescribed

Neurontin, nothing in the record indicates that she was ever prescribed Oxycontin.

On the same day, Defendant spoke with her sister about how her girlfriend was angry

because another inmate at Carswell had written the girlfriend to tell her that she and Defendant

were sexually intimate.  Defendant explained that the inmate at Carswell was taking care of her

by buying her hygiene and commissary materials and food, "And then she would give me a '40'

of fucking Oxycontin a day.  So yeah, she was taking care of me and supporting my habit . . . .

$400 a month, that was my allowance she would give me.  $400 a month.  And then every day,

she would give me a '40.'  And a '40' goes for $25 a fucking – a pill."  Finally, on December 16,

2011, Defendant spoke with her uncle, telling him that "I wasn't eating anything in prison

because I was getting so  high all the time, that I was just getting high, getting high, and then

forgetting to eat for, like, three days."

Defendant's disciplinary record from Bureau of Prisons Federal Medical Center in

Carswell, Texas ("FMC Carswell") is equally troubling.  Her record shows that she was

disciplined twice for the use of drugs or alcohol.  On one of these instances, Defendant's urine

sample tested positive for morphine.  The hospital pharmacy indicated that she had not been

prescribed or administered any drugs that would cause a positive result.  Further, on October 22,

2010, Defendant entered a drug education class at FMC Carswell, but was expelled from the

class on January 11, 2011.  The reasons for her expulsion were "repeated tardiness to class and

repeated refusal to follow directions of the instructor.  Specifically, [Defendant] continued to

wear headphones during the class after being instructed not to by the teacher."  Defendant also

never applied to the non-residential drug treatment program available to inmates at FMC

Carswell.  Even Defendant's expert witness, psychologist Elliot Rappaport, notes that "[w]hile it

is most certainly true that Ms. Lente had opportunities to seek treatment for [Major Recurrent Depressive Disorder, Dissociative Amnesia, and Alcohol Abuse], it is equivalently clear that she has not done so."  (Doc. 155-1 at 5).

Finally, on April 27, 2012, the United States Marshals at TCDC intercepted a letter sent to Defendant containing five strips that tested positive for Suboxone, a prescribed medication used to treat opiate addictions.  The illegal introduction of Suboxone has become a significant problem in prisons.  *See*, *e.g.*, "When Children's Scribbles Hide a Prison Drug," New York Times, May 26, 2011, at p. 2 (**doc. 147-9**).  The letter came from a former inmate with whom Defendant had engaged in an intimate relationship when both were incarcerated at FMC Carswell.  Although the Government has offered no evidence that Defendant solicited the drugs or even knew her girlfriend intended to send them, it is unlikely the girlfriend would have sent the contraband without any expectation that Defendant knew what to do with it.

This Court recognizes that Defendant comes from an abusive background, that she has submitted evidence demonstrating that her abuse of alcohol and drugs arises out of a need to self-medicate untreated major depressive disorder, and that recovery from addiction is neither simple nor straightforward.  Nonetheless, evidence that Defendant has continued to abuse drugs and has failed to participate in the substance abuse programs available to her does not inspire confidence in her future conduct or suggest the potential for effective rehabilitation.  By so noting, this Court does not suggest, as defense counsel contends, that Defendant is "untreatable evil personified" or "a piece of trash to be discarded."  But neither can this Court dispute that her post-conviction behavior indicates that the seven years Defendant has already served have as yet failed to deter her from further criminal conduct, and her willingness to engage in such conduct puts the public at danger.

Therefore, I find that a substantial sentence is necessary to deter Defendant from future offenses and to protect the public from further crimes by Defendant.[10]

Need to avoid unwarranted sentencing disparities between similar defendants convicted of similar crimes.  Finally, under 18 U.S.C. § 3553(a)(6), and in response to the Tenth Circuit in *Lente II*, this Court considers the need to avoid unwarranted sentencing disparities between similar defendants convicted of similar crimes, and finds that a sentence of 192 months would not create such a disparity.

It is true that Defendant's sentence falls outside the mainstream of sentences for involuntary manslaughter; 192 months is above both the median percentage increase over the maximum end of the guideline range and the median number of months above the highest point of the range.  *Lente II*, at 1033.  Thus, Defendant contends that her sentence violates § 3553(a)(6). However, as the Fifth Circuit has noted, "disparity in sentencing, standing alone, is insufficient to render a sentence substantively unreasonable."  *United States v. Key*, 599 F.3d 469, 475 (5th Cir. 2010) *cert. denied*, 131 S. Ct. 997, (U.S. 2011).  It is only an *unwarranted* disparity that renders a sentence substantively unreasonable.  Like the other § 3553(a) factors, disparity must be considered as part of the totality of the circumstances:

> The sentencing court is 'directed to make an individualized assessment based on the facts presented,' with respect to each defendant in each case.  An argument premised solely or primarily on disparity necessarily negates this command, asking the sentencing court to look to others rather than the defendant standing before it.  Further, this argument overlooks that disproportionate offenses may warrant disproportionate sentences; these would evince, by definition, disparity.  Under *Gall*, however, they would not necessarily be impermissible.

---

[10] I also note that the Defendant would unquestionably benefit from the educational and vocational training provided by the Bureau of Prisons.  Lente briefly attended high school in Albuquerque, New Mexico, where she completed zero credits and left with a 0.0 grade point average.  Furthermore, she has been employed for a total of only 85 days in her life.   I do not rest my upward variance on this ground, however, because 18 U.S.C. § 3582(a) "precludes sentencing courts from imposing or lengthening a prison term to promote an offender's rehabilitation."  *Tapia v. United States*, 131 S. Ct. 2382, 2391, 180 L. Ed. 2d 357 (2011).

*Id.* at 475-76 (citing *Gall v. United States*, 552 U.S. 38, 50 (2007)).

Defendant's reliance on cases in which defendants convicted of involuntary manslaughter received lower sentences is unavailing, as the cases she cites involve defendants who are not similarly situated, whether on the law or the facts.  For instance, Defendant cites *United States v. Wolfe*, in which the defendant drove drunk with five friends in her vehicle and crashed, killing two of the passengers.  435 F.3d 1289, 1292-93 (10th Cir. 2006).  Her BAC was 0.13 four hours after the crash, and she had no criminal history besides traffic tickets.  The sentencing guideline range under the applicable guidelines was 12 to 18 months, and the court departed upwards to 41 months.  The Tenth Circuit vacated the sentence on the ground that the district court failed to adequately explain its upward departure, and on remand, the defendant was sentenced to 20 months.  However, the *Wolfe* Court also vacated the sentence because it held that the sentencing court could not depart upward based on factors already considered in the sentencing guidelines, as this constituted impermissible "double-counting."  *See id.* at 1303.  Since *Wolfe*, *United States v. Gall*, 552 U.S. 38, 49-50 (2007), and *Kimbrough v. United States*, 552 U.S. 85 (2007), abrogated the case law on which *Wolfe* relied and approved such "double-counting."  *Compare Wolfe*, 435 F.3d at 1302 ("The district court thus impermissibly double counted when it departed upward three levels because Wolfe's conduct resulted in two deaths, when the guideline calculation had already accounted for the two deaths.") *with Key*, 599 F.3d at 475 ("[G]iving extra weight to circumstances already incorporated in the guidelines, such as the death of [the victim], is within the discretion of the sentencing court." (citing *Gall* and *Kimbrough*)); *see also United States v. Yanez-Rodriguez*, 555 F.3d 931, 946 (10th Cir. 2009) ("District courts have broad discretion to consider particular facts in fashioning a sentence under 18 U.S.C. § 3553(a),

even when those facts are already accounted for in the advisory guidelines range."). Therefore, *Wolfe* is inapposite here.

The other cases Defendant cites can be distinguished on their facts.[11]  In *United States v. Pettigrew*, the Tenth Circuit affirmed a sentence of 126 months, or three months above guidelines range, for a defendant who had killed one person and seriously injured two in a DWI accident.  468 F.3d 626, 639-42 (10th Cir. 2006).  Although the defendant had previously been convicted of committing second degree murder while drunk, his case involved three victims, not four, and one death, not three.  Similarly, the defendant in *United States v. Spencer*, 387 F. App'x 841 (10th Cir. 2010), who had three prior DWI convictions and refused a breath test but admitted he was driving drunk, received a sentence of 96 months for an accident in which one woman was killed and a twelve-year-old girl was seriously injured.  While both of these defendants had significant criminal histories, because I vary upward to adequately take into account the fact that Defendant's offense resulted in multiple deaths, I find the number of victims and deaths more pertinent for comparison.

In *United States v. Jim*, the defendant was driving drunk with three passengers when he crashed, killing two of the passengers and seriously injuring the third.  377 Fed. App'x. 789 (10th Cir. 2010).  He sought a downward departure and/or variance based on family responsibilities, and received a sentence of 57 months, within the guidelines range of 51 to 63 months.  *Id.* at 791-92.  However, the Court finds that Defendant here is not similarly situated to the *Jim*

---

[11] This includes two cases that do not involve drunk driving: *United States v. Munoz-Tello*, 531 F.3d 1174 (10th Cir. 2008) (affirming sentence of 96 months for four deaths and additional injuries caused by defendant crashing van in which he was illegally transporting twelve undocumented persons), and *United States v. Oba*, 317 Fed. App'x. 698 (9th Cir. 2009) (unpublished) (vacating sentence of 72 months imposed for reckless operation of a boat, which sank and led to the drowning deaths of three passengers).  Additionally, although the *Oba* court noted that a similarly-situated defendant had received a sentence of only 18 months, it vacated the sentence on procedural grounds, for failure to consider the defendant's argument that similarly-situated defendants had received lower sentences, and failure to adequately explain imposition of the 72-month sentence.  317 Fed. App'x. at 700.  Therefore, the 9th Circuit never addressed the substantive reasonableness of the 72-month sentence..

defendant.  First, because *Jim* involved the denial of a downward variance and imposition of a within-guidelines sentence, it does not speak to the substantive reasonableness of an upward departure.  Second, at the time of the crash, the *Jim* defendant's BAC was between 0.14 and 0.18, *id.* at 791, whereas Defendant's BAC was significantly higher.  Third, the accident here involved an additional death.  And finally, without minimizing the tragedy of their deaths, the victims killed and injured in *Jim* chose to ride with a drunk driver, unlike the victims in the vehicle driven by Jessica Murillo.

Looking beyond this Circuit, Defendant points to *United States v. Kathman*, in which the Sixth Circuit upheld a below-guidelines sentence of 20 months for two counts of involuntary manslaughter where the twenty-two year old first offender, who had been drinking with friends, lost control of his car while driving through a national park at night and killed his two passengers.  490 F.3d 520, 521-22 (6th Cir. 2006).  Again, *Kathman* involved fewer victims than in the present case, and, without in any way minimizing the tragedy of their deaths, the victims in *Kathman* chose to ride in a car with a driver who had been drinking, while the victims in the Murillo vehicle had no association with Defendant and were simply in the wrong place at the wrong time.  Further, the *Kathman* defendant's BAC was lower than Defendant's, he had been driving on an isolated park road rather than a well-traveled urban corridor, and he had no criminal history.  *Id.* at 526 (describing the defendant as "a law abiding fine young man who made a bad mistake on this evening, and [used] poor judgment," and as "a high school athlete, [who] worked to pay his way through college, and . . . [i]n more than 20 letters submitted on the defendant's behalf by friends, family, and coworkers . . . was described as responsible, honest, caring, hard-working, and trustworthy").  The sentencing court also expressly described the case as involving a lower degree of recklessness than commonly seen in involuntary manslaughter

cases.  *Id.* at 525-26 ("[T]his case did not involve the high speeds or severe intoxication that is often the case . . . . [and] involuntary manslaughter resulting from drunk driving often involves a higher degree of recklessness than was evident in this case.").

In *United States v. New*, the defendant received a sentence of 144 months after being convicted of two counts of involuntary manslaughter for a drunk-driving accident in which his two passengers were killed.  The facts were egregious: The defendant had a BAC of .32, fled the scene of the accident, claimed one of the dead was the driver, perjured himself at trial, and had two prior DWIs, 23 criminal history points, and 13 uncounted points.  491 F.3d 369, 374-75, 379 (8th Cir. 2007).  However, his actions resulted in the deaths of two people who chose to drive with him, not three deaths and serious injury to a fourth victim, especially when three of those victims were simply in the wrong place at the wrong time.  Further, the Eighth Circuit rejected the *New* defendant's argument that because his sentence was "the longest federal sentence in the country for vehicular homicide in the last ten years," it necessarily created unwarranted disparities, concluding that the sentence simply reflected differences in offense conduct or criminal histories.  *Id.* at 379-80.

Finally, Defendant also points to *United States v. Black Robe*, in which a defendant was originally sentenced to 24 months (pre-*Booker*) for driving drunk and engaging in a high-speed chase with the police, during which the passenger in his truck was killed.  521 F.3d 909, 910 (8th Cir. 2008).  Again, this case involved fewer victims, and the victim had chosen to drive with the defendant.  Further, the case provides no further details about this conviction, including the defendant's BAC at the time of the accident and his criminal history, making comparison impossible.

In sum, the cases Defendant cites do not demonstrate that her sentence creates an unwarranted disparity with other involuntary manslaughter sentences, because her offense exhibits equal or greater recklessness and carried graver consequences. I find the Fifth Circuit's decision in *Key* instructive on this point. The *Key* defendant received a sentence of 216 months for an accident in which, driving under the influence of numerous illegal drugs, he struck a car stopped at a red light and killed its driver, a sergeant at Fort Hood. The Guidelines range for his sentence was from 46 to 57 months. The Fifth Circuit affirmed the sentencing court's upward variance, finding that the defendant's conduct had exhibited such recklessness that the Guidelines sentence failed to reflect the gravity of his offense. *Id.* at 475. It noted that where a defendant has acted with such recklessness "as to demonstrate a complete lack of regard for human life," a sentence in the guidelines range may not appropriately reflect the seriousness of those actions. Rather, "[i]t is reasonable to punish [the defendant]'s offense more harshly than run-of-the-mill involuntary manslaughter, such as might be committed by a distracted, but not intoxicated, driver." *Id.* The Fifth Circuit's reasoning applies equally here.

Sentence. For these reasons, I find that a sentence of 192 months is sufficient, but not greater than necessary, to comport with the goals of sentencing. In arriving at a sentence of 192 months, I first impose a term of 72 months for each of the involuntary manslaughter counts. Seventy-two months, or six years, is the statutory maximum for involuntary manslaughter. The 72-month terms imposed for Count I (relating to Joshua Romero) and Count II (relating to Andres Murillo) shall run consecutively for a total of 144 months or 12 years. The 72-month term imposed for Count 3 (relating to Anthony Tewaheftewa) shall run concurrent to Counts 1 and 2, reflecting the fact that he chose to consume excessive amounts of alcohol and ride with Defendant. In addition, I impose a term of 120 months, or 10 years, for the assault on Jessica

Murillo resulting in serious bodily injury.  Forty-eight months of that 120-month term will run consecutively to Counts 1, 2, and 3, to reflect the gravity and severity of the injuries Ms. Murillo received, and the remaining 72 months will run concurrently to Counts 1, 2, and 3. Consequently, I impose a sentence of 192 months' imprisonment, or 16 years, for Defendant's offenses.

Finally, the terms and conditions of supervised release and amounts of restitution shall be stated in the Judgment and Commitment order which shall subsequently issue in this case.

SO ORDERED

_____
UNITED STATES DISTRICT JUDGE